# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 17, 2011

## STATE OF TENNESSEE v. TIMOTHY CHRISTOPHER PILLOW

### Direct Appeal from the Criminal Court for Davidson County
### No. 2009-D-2885    Cheryl Blackburn, Judge

---

### No. M2010-02107-CCA-R3-CD - Filed December 13, 2011

---

A Davidson County jury convicted the Defendant, Timothy Christopher Pillow, of aggravated robbery, and the trial court sentenced him to ten years to be served at 100%. On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his conviction; (2) the trial court erred when it failed to declare a mistrial based upon a detective's testimony that the Defendant had previously been incarcerated; and (3) the trial court erred when it enhanced his sentence. After a thorough review of the record and applicable authorities, we conclude no error exists in the trial court's judgment. The trial court's judgment is, therefore, affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and DONALD PAUL HARRIS, SR. J., joined.

James O. Martin, III, Nashville, Tennessee for the appellant, Timothy Pillow.

Robert E. Cooper, Jr., Attorney General and Reporter; Sofia S. Lee, Assistant Attorney General; Victor S. Johnson, III, District Attorney General, and Jennifer McMillen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the robbery of Joseph Manna on February 26, 2008. For this robbery, a Davidson County grand jury indicted the Defendant for especially aggravated

robbery. At his trial, on July 12, 2010, the following evidence was presented: Chrissy Plummer testified she was living at the Riverchase apartment complex in February 2008. Her best friend, Joseph Manna, had been at her apartment playing video games and drinking vodka and orange juice on February 26, 2008, which she recalled was a cold and snowy day. Throughout the day, she and Manna became intoxicated, and, at some point the two got into an argument over one of the video games. Between 8:00 and 9:00 p.m., Manna, who was intoxicated, called for someone to give him a ride home. Manna left, and Plummer went outside to check on him. She did not see him but saw footprints leading from her apartment, around the corner, to the other side of her apartment building. The footprints led to the apartment of a woman nicknamed "Chicken." While uncertain, Plummer believed that the woman's given name was "Latisha Burns."

On cross-examination, Plummer testified that Manna had spent the night at her house on February 25th, but she maintained the two were not dating. She said that they simply played video games together for two days in a row. After the two got into an argument over the video game, she told him that he was going to have to "get out." She agreed that Manna did not live close to her, and she felt badly after he left that she made him leave.

Joseph Manna, the victim, testified that he lived in Nashville in February 2008. He agreed he hit a "rough patch" in his life, which involved drinking heavily, having poor peers, and committing an aggravated burglary. On February 26, 2008, he brought his Xbox and some video games, all of which he stored in a red "Swiss" duffle bag, to Plummer's[1] apartment. Plummer and Manna played video games and consumed alcohol for a couple of hours before getting into an argument. Manna, who was intoxicated "to a degree," called his roommate, who agreed to come and pick him up. Manna left Plummer's apartment between 8:00 and 10:00 p.m., carrying his Xbox and belongings with him, and went to the front entrance of the apartment complex to wait for his roommate to arrive.

Manna said that, while he was waiting, two men, Deonte Matthews and the Defendant, approached him while Latisha Burns "linger[ed] behind with her door open." The men asked him if he wanted to come inside because it was cold. Manna agreed, went into the apartment, and sat down. The four discussed "random stuff," and, at some point, three younger girls, one of whom Manna thought was Burns's daughter, arrived. Manna then told the others that he had his Xbox with him if they wanted to set it up while he waited on his ride to pick him up. "Deonte" went into Manna's bag, and, shortly thereafter, Manna was hit on the head with a revolver, causing him to bleed. Manna said that the Defendant and Matthews were the only two men in the apartment, and he was not sure which man hit him

---

[1]Manna refers to Chrissy Plummer as "Chrissy Smith." In accordance with her own testimony, we will refer to her as "Chrissy Plummer."

with the gun.  He thought, however, that one man hit him and the other man went through his pockets while the man who hit him held the gun to his head.  He was sure Matthews was the man who went through his pockets and told him that he "need[ed] to get out of this apartment right now."  Manna said that upon hearing this he fled the apartment, went to the nearest apartment, and asked the resident to call 911.  As he left this apartment, he saw a car "peeling out of the parking lot."  Manna said the two men took from him a cell phone, cash, a wallet, his Xbox, and games.

Manna testified that he went by ambulance to the hospital, where he received three or four staples to the top of his head where he was hit.  He said the staples remained in his head for two weeks and that he still had a scar.  Manna said he positively identified both the Defendant and Matthews in a police lineup and that he also recognized them in court at the trial.

On cross-examination, Manna testified that he was in Burns's apartment about thirty to forty-five minutes before being hit in the head.  Manna said that the three young girls who had entered the apartment had gone upstairs in the apartment before he was hit in the head.

Tanique Harrison testified on February 26, 2008, she was at a birthday party for her sister, after which she accompanied some friends to the apartment of her aunt, Latisha Burns. She said that present at the apartment were Burns, a man she knew as "Little D," a man she knew as "Poker," and a "little white boy," whom she identified as Manna.  In court, Harrison identified "Little D" as Deonte Matthews and "Poker" as the Defendant.  Harrison recalled that, on the night of February 26, while she was at Burns's apartment, she felt Manna was flirting with her.  She told Burns, who explained that Manna was there waiting for a ride. Harrison said that after learning this, she went back into the living room where the Defendant pulled out a gun, "jumped up and told the little white boy to give him his stuff and hit the little white boy in the head" one time.  Harrison said Manna kept saying, "I quit I quit," while Matthews went through his pockets.  The men then told Manna to leave the apartment. Harrison said that Matthews and the Defendant then left the apartment with Manna's duffle bag.

Harrison said that police came to the apartment later that evening and questioned her about the events that occurred there.  She said she did not give them her real name because she was a "juvenile runaway" and feared she would be "locked back up" if the police learned her identity.  Further, she did not tell them an accurate account of the events because she "was like, I ain't got nothing to do with that."  Harrison said that, the detective left and returned a few minutes later and told her she could be charged with a felony if she lied to police.  She said that she then told them the truth about the events that occurred that night.

3

On cross-examination, Harrison testified that the attack occurred shortly after she arrived at Burns's apartment. She said that no one told her what to say or told her to lie to police. She agreed that, while she told the detective the truth about the attack, she did not give him her real name. She agreed that she did not know the Defendant before this night and that she had not seen him since. She did, however, identify him from a police lineup of pictures.

Latisha Diwan Burns testified her friends often called her "Chicken," a name given to her by her aunt when she was first born. On February 26, 2008, Burns was living in an apartment in the Riverchase Apartments, and present at her home were Harrison and Harrison's two friends, "Little D" and "Poker." She said that, at the time, she did not know the real name for either "Little D" or "Poker," but she identified the Defendant as the man she knew as "Poker" and Deonte Matthews as "Little D." She explained that she knew Matthews because both Matthews and Matthews's grandmother lived in her apartment complex.

Burns testified that, during that evening, she consumed marijuana, cocaine, and alcohol. She was uncertain how much marijuana she smoked, but said she smoked the marijuana and the cocaine together. She was also uncertain how much alcohol she drank. After this, she saw someone standing outside her apartment by a tree. The man, who carried a duffel "gym" bag with him and appeared intoxicated, was "invited" inside, and he accepted the invitation. Burns said they were all "just there chilling" when Harrison and her two friends arrived. Thereafter, the Defendant and Matthews pulled Burns aside and told her that they were going to "rob" the man and take what he had. Burns described the robbery, saying:

> [The Defendant] got up and pulled out a gun, and it was kind of like under his shirt so [Manna] couldn't see it. And he told [Manna] to give him his stuff. And I guess [Manna] thought that he was playing with him because he didn't give it to him. And [the Defendant] hit him in the head with the gun, and then [Matthews] went through his pockets and his duffle bag while [the Defendant] had the gun on him so that he wouldn't move.

Burns testified that she saw Matthews and the Defendant take Manna's cell phone and wallet. After robbing Manna, the two men told him to get up and leave. Matthews and the Defendant left, taking Manna's personal belongings with them.

Burns testified that, when police officers came to her home later, she did not tell them the truth because she was "scared." She described her apartment complex as "a step up above the projects," and said she did not want to be labeled as someone who had cooperated with the police, in part because of the "lifestyle [she] was living and the people [she] was

4

hanging around." When the detective came a second time, however, she told him the truth because she felt she could not keep telling lies.

Burns admitted that she had previous convictions for forgery and that she was also arrested and charged in connection with this robbery. She said that she and Matthews were co-defendants in the robbery case but that she pled guilty to perjury and making a false report.

On cross-examination, Burns testified that she did not recall how much time elapsed between the time that Manna left her apartment and police arrived. Burns agreed that she originally thought "Poker's" given name was "Mike." Burns testified she had not made an agreement with the State that she would testify against the Defendant and that she was doing so because it was "the right thing to do." She explained that, since this incident, she had changed her lifestyle. She said she knew that she was going to be called as a witness but that her testifying was not part of her plea agreement.

On redirect examination, Burns testified that she had previously testified against Matthews at Matthews's trial for robbing Manna.

Kevin Carroll, an internal affairs investigator with the Davidson County Sheriff's Department, testified that his responsibilities included monitoring the phone calls of inmates in Davidson County. He said that when an inmate initiated a phone call from the jail they received a prerecorded tag that informed the inmate and the person receiving the inmate's call that the call may be monitored or recorded. Investigator Carroll identified a recording of a telephone call initiated by an inmate using the Defendant's jail PIN identification number. On cross-examination, he conceded that another inmate could have initiated the call with the Defendant's PIN number, a situation that had occurred in the past. Investigator Carroll also agreed he was unaware of to whom the call was placed.

Chris Barnard, a Special Agent with the Tennessee Department of Correction (TDOC), testified that it is the regular course of business for inmates conversations to be recorded. He confirmed the warning received by an inmate before his call was connected. He also confirmed that every inmate was given a unique PIN number to use to place calls. Special Agent Barnard then identified a recording of an excerpt of a conversation initiated on November 3, 2009, by an inmate using the Defendant's PIN number. On cross-examination, he also agreed that a different inmate could use the Defendant's PIN number to initiate a phone call, but he explained that any inmate using the Defendant's PIN number could only call one of the numbers listed from the ten numbers on the Defendant's approved phone number list.

5

Paul Harris, a detective with the Metropolitan Nashville Police Department, testified that he responded to a call about a robbery that occurred in the Riverchase apartment complex on February 26, 2008. Detective Harris testified that, when he arrived at the scene, Manna had already been transported to the hospital and neither the Defendant nor Matthews were present at the scene. He spoke with Burns and Harrison, who gave him false names. Later, the detective went to the hospital emergency room, where he met and interviewed Manna. Manna did not appear "intoxicated," but the detective "sensed he might have been drinking." The detective asked Manna if he had consumed any alcohol, and Manna said he had been drinking that day and then Manna described for him the events surrounding the robbery. Detective Harris said Manna's story did not comport with the story given to him by Burns and Harrison.

Detective Harris testified that, based upon the inconsistencies in the stories, the detective enlisted the aid of another detective and returned to Burns's apartment to speak with her again. When the police officers returned, both Burns and Harrison were present in the apartment. Detective Harris asked Burns for consent to search her apartment, and Burns gave her consent. The detective said that the search revealed nothing of interest. The detective said he confronted Burns with facts that her story "didn't match up" with the victim's story. At that point, Burns and Harrison retold what had happened that evening, and both of their respective stories matched the victim's story.

Detective Harris said that both women provided him "nicknames" for the two men involved in the robbery. Based upon the nickname "Little D," the detective was able to create a photographic lineup that included a picture of Deonte Matthews, along with photographs of five other men who looked similar to Matthews. The detective then identified a photographic lineup that "a witness would never see." The lineup depicted the Defendant's profile picture. The detective explained how the photographic lineups were generated, saying that they had computer software that allowed officers to input search criteria to sort through "mugshots" to find the pictures of five other people who looked similar to the suspect.

Detective Harris testified that, after creating these lineups, he showed them to Manna, who identified Deonte Matthews as the man who "went through his pockets." Manna did not identify the Defendant from the photographic lineup that contained the Defendant's picture. The detective explained that Manna had described the Defendant as having a certain hairstyle, and the Defendant's picture in the photographic lineup showed him with a different type of hairstyle. When the detective showed Burns the two lineups, Burns identified the photographs of Matthews and the Defendant as depicting the two men who robbed Manna. When Harrison viewed the lineups, she also identified the pictures of both Matthews and the Defendant as depicting the two men who robbed Manna. Based upon these identifications,

the detective arrested the Defendant.

After the Defendant's arrest, the detective interviewed him, and the Defendant told the detective that he lived at Riverchase apartment complex. The detective said he had some trouble understanding the Defendant, but that the Defendant told him that his nickname was "Poker" or "Pokey."

The detective testified that he had listened to the audio recordings made of the Defendant's phone calls while he was incarcerated. He recognized the Defendant's voice on those recordings. On one recording, the Defendant is heard having the following conversation:

FEMALE: We gotta get him a lawyer.

[THE DEFENDANT]: We don't need to talk about that though. What I was telling you about yesterday. I think . . . . I think little bro, little bro he'll deny it 'ya feel me?

FRIEND: Yeah your good as long as you ain't said nothing to incriminate yourself.

[THE DEFENDANT]: Hell nah. Like I told him man, look here – I'm silent about it. But then little bro gotta be silent about it too cause they don't know shit ya feel me? But then, I mean I'm on some shit. Fuck it though whatever whatever.

. . . .

[THE DEFENDANT]: This is what I told you about whenever I came to court.

FEMALE: Yeah yeah. I know that.

[THE DEFENDANT]: This has got something to do with the little nigger. You gonna – you gonna – you gonna remember this nigger's name. You remember the Little D nigger?

FEMALE: Little D?

[THE DEFENDANT]: Little D nigger. You remember you were like I don't want him around. The little bitty nigger that was coming around. . . . That's

7

what they asked me was did I know him and shit ya feel me?

FEMALE: Uh huh. That's the one whose Grandmomma use to live around the corner.

[THE DEFENDANT]: Yeah yeah.

On cross-examination, Detective Harris testified that Harrison provided him a false name when he first interviewed her. She eventually told the detective her real name and told him that she was a "runaway." He agreed that, when Burns identified the Defendant, some thirteen months after the robbery, she was not free to leave after the identification because she was being held in relation to the robbery in this case.

Based upon this evidence, the jury convicted the Defendant of aggravated robbery.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his conviction; (2) the trial court erred when it failed to declare a mistrial based upon the detective's testimony that the Defendant had previously been incarcerated; and (3) the trial court erred when it enhanced his sentence.

### A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions because the evidence did not sufficiently prove his identity as the perpetrator of this crime. He notes that the victim, Manna, could not identify him from a photographic lineup and was intoxicated at the time of the robbery. He states that Burns, who he avers is an unreliable witness and was also intoxicated at the time of the robbery, only identified him while she was in custody. Further he states that Harrison, the other witness who identified him, only did so after she was threatened with criminal perjury charges and more than a year after the robbery. The State counters that the Defendant is challenging the credibility of the witnesses, an issue that is to be determined by the jury.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence,

circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The identity of the perpetrator is an essential element of any crime, and it, therefore, must be proven by the State beyond a reasonable doubt. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). We would also note that issues of identity and credibility are classic jury questions. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *no Tenn. R. App. P. 11 application filed*. Further, as stated above, questions concerning the credibility of the witnesses are resolved by the trier of fact. *Evans*, 108 S.W.3d at 236. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury.

At the Defendant's trial, the victim identified the Defendant as his assailant. He was specifically asked "Now, when you look over at [the Defendant] today, do you recognize him?" The victim responded "I do . . . [I recognize him by his] [f]acial features, the hair, complexion." He further said he was "[o]ne hundred percent" certain that the Defendant was the man who attacked him. This alone is sufficient to prove the Defendant's identity as his attacker. *See State v. Toomes*, 191 S.W.3d 122, 130 (Tenn. Crim. App. 2005).

There was, however, ample other evidence supporting the Defendant's identity. Both Burns and Harrison identified the Defendant from a photographic lineup. The Defendant calls into question the reliability of those witnesses, based upon Burns's intoxication, untruthfulness with police, previous convictions, interest in assisting the State and also based upon Harrison's untruthfulness with the police, previous convictions, and the duration between the incident and her identification of the Defendant. The Defendant brought out these facts during his cross-examination of these witnesses, and the witness's credibility is a determination left to the jury. We conclude that the evidence supports the jury's finding that the State proved beyond a reasonable doubt that the Defendant was the man who robbed the victim. He is not entitled to relief on this issue.

## B. Mistrial

The Defendant contends that the trial court erred when it failed to declare a mistrial based upon the detective's testimony that the Defendant had previously been incarcerated. The State counters that the Defendant never objected to the testimony and never moved for a mistrial. Further, it contends that the trial court immediately instructed the jury to disregard the testimony and that there was, therefore, no manifest necessity to declare a mistrial.

During the Defendant's cross-examination of Detective Harris, the following occurred:

[Detective Harris]. Well, Ms. Burns knew this person's nickname to be Poker or Pokey. Mr. Manna wasn't able to supply that information. That leads me to believe that she's been around him more than once, and she knew his name.

[Defendant's attorney]. But in your report did she not state to you when she was, quote, telling the truth that she didn't know him?

[Detective Harris]. Well, she . . . initially she totally lied and said nothing ever happened in my house. But she did eventually tell me his name is Pokey or Poker, I think he just got out of the pen. And she told me how to find Deonte Matthews by going to his now deceased grandmother's house. . . .

10

[Defendant's attorney]. Did she also tell you –

THE COURT: Wait a minute. Ladies and gentlemen, you are to disregard the statement that she made to him about where [the Defendant] had been.  Do not consider that for any reason what so ever.

The Defendant had no further questions for Detective Harris, the State and the Defendant both rested.  The Defendant never objected to the statement and never moved for a mistrial.  The Defendant has waived our review of this issue by failing to object contemporaneously or move for a mistrial.  *See* Tenn. R. App. P. 36(a); *State v. Robinson*, 971 S.W.2d 30, 40 (Tenn. Crim. App. 1977).  Further, given the strong evidence of the Defendant's guilt, we conclude that this issue does not require plain error review because reversal is not necessary to do substantial justice.  Tenn. R. Crim. P. 52(b); *State v. Adkisson*, 899 S.W.2d 626, 638 (Tenn. Crim. App. 1994).  The Defendant is not entitled to relief on this issue.

### C.  Sentencing

The Defendant next contends that the trial court erred when it enhanced his sentence from the minimum of eight years to ten years.  The State counters that the trial court properly sentenced the Defendant.  At the Defendant's sentencing hearing, the parties agreed that the Defendant was on parole for a previous aggravated robbery conviction at the time of this offense.  Because this was his second violent felony conviction, pursuant to Tennessee Code Annotated section 40-35-501(k), he would have to serve his sentence at 100%.  Further, because he was on parole at the time he committed the second aggravated robbery, his sentence would have to run consecutively to the sentence for which he was on parole at the time of this incident.

During the Defendant's sentencing hearing, the Defendant's father testified that the Defendant's "brief background" did not accurately reflect upon the Defendant, and he maintained that the witnesses incorrectly identified the Defendant as the robber in this case. He described their living conditions as poor and said the Defendant needed an opportunity to go to school.  The Defendant's father asked that the Defendant be given the minimum sentence and also ordered to attend  a rehabilitation program.

The trial court found that three enhancement factors applied to the Defendant's sentence.  First, the trial court found that enhancement factor (1) applied because the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range.  *See* T.C.A. § 40-13-114(1) (2006).  The trial court noted that the Defendant had previously been convicted of possessing drugs, in addition to

his two aggravated robbery convictions. The trial court also found that enhancement (8) applied, because the Defendant had failed to comply with conditions of a sentence involving release into the community. *See* T.C.A.§ 40-13-114 (8) (2006). It noted that, after the Defendant's conviction for drug possession, he was placed on probation. While he was on probation he committed his first aggravated robbery. While on parole for the aggravated robbery, he committed the second aggravated robbery, which is the subject of this appeal. Finally, the trial court found that enhancement factor (13) applied, because the Defendant committed this aggravated robbery while he was on parole for another offense. *See* T.C.A. § 40-13-114 (13) (2006). The trial court then found that no mitigating factors applied to the Defendant's sentence. It set the Defendant's sentence at ten years, the middle of his sentencing range.

On appeal, the Defendant argues, first, that there is no affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances and that this Court should, therefore, review the trial court's sentence without a presumption of correctness. He further asserts that the trial court should have given more weight to the Defendant's father's plea for leniency.

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court properly sentenced the defendant. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts. If the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2010), *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the

principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Significantly, the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors. *See State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008) (citing 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9). Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2010); *Carter*, 254 S.W.3d at 343.

Contrary to the Defendant's contention, the record shows that the trial court made the relevant considerations when determining the Defendant's sentence. While it did not specifically address the testimony of the Defendant's father when it declined to apply any mitigating factors, it is not statutorily obligated to do so. The trial court considered and articulated in the record all the applicable enhancement factors and that there were no applicable mitigating factors. It then sentenced the Defendant to the midpoint of his applicable sentencing range. This sentence is supported by the record. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that there exists no error in the trial court's judgment. The trial court's judgment is, therefore, affirmed.

_____

ROBERT W. WEDEMEYER, JUDGE

13